# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ALEXANDRIA VENTURE INVESTMENTS, LLC and ALEXANDRIA EQUITIES NO. 7, LLC, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0593-PAF |
| VERSEAU THERAPEUTICS, INC., | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: October 1, 2020
Date Decided: December 18, 2020

Raymond J. DiCamillo, Megan E. O'Connor, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Luke Cadigan, COOLEY LLP, Boston, Massachusetts; Patrick Gunn, COOLEY LLP, San Francisco, California; *Attorneys for Plaintiffs Alexandria Venture Investments, LLC and Alexandria Equities No. 7, LLC*.

David J. Teklits, Thomas P. Will, MORRIS, NICHOLS, ARSHT, & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendant Verseau Therapeutics, Inc.*

**FIORAVANTI, Vice Chancellor**

Plaintiffs Alexandria Venture Investments, LLC ("Alexandria Venture") and Alexandria Equities No. 7, LLC ("Alexandria Equities" and together with Alexandria Venture, "Alexandria") seek an order to compel inspection of books and records of Verseau Therapeutics, Inc. ("Verseau" or the "Company") pursuant to Section 220 of the Delaware General Corporation Law ("DGCL"). Alexandria aims to investigate, among other things, whether Verseau's directors violated their fiduciary duties when they rejected a financing proposal from Alexandria. In this post-trial Opinion, I conclude that Alexandria is entitled to inspect some, but not all, of the categories of books and records sought in the demand.

## I.    BACKGROUND

The facts recited in this Opinion are the Court's findings based on the testimony and documentary evidence presented at a half-day trial on October 1, 2020. The record includes stipulations of fact contained in the parties' Pretrial Stipulation and Order ("PTO"), the 62 trial exhibits, and deposition testimony from one witness, Aaron Jacobson.[1] The following facts were either uncontested or have been proven by a preponderance of the evidence.

---

[1] Citations in the form "Tr." refer to the trial transcript. Citations in the form "JX" refer to trial exhibits with pinpoint citations to the last three digits of the relevant Bates number. Citations in the form "Dep." refer to the Jacobson deposition transcript.

## A.    The Parties

Verseau is a privately held Delaware corporation founded in 2017 to develop immunotherapies to treat cancer.  During relevant events and at least until June 30, 2020, Verseau's board of directors (the "Board") consisted of seven individuals: Christine Bunt, George Golumbeski, Zhenping Zhu, Jong Chang, Wen Chen, Bob Langer, and Daniel Anderson.[2]  Bunt was Verseau's Chief Executive Officer during that same time period.[3]  Golumbeski is the chairman of the Board, having previously served as Executive Vice President of Business Development at Celgene Corporation ("Celgene"), a biotechnology company.[4]  Golumbeski initially joined Verseau as an advisor in 2018, and he continued to provide consulting services to Verseau after joining the Board in 2019.[5]  Golumbeski owns approximately 1% of Verseau's stock on a fully diluted basis.[6]  Zhu is affiliated with 3SBio Inc. ("3SBio"), a biotechnology company based in China, where he serves as President of Research & Development and Chief Scientific Officer.[7]  3SBio owns 11.8% of the Company's stock.[8]  Chang is the founder and chairman of InHarv Partners Ltd.

---

[2] Pretrial Stipulation and Order ("PTO") ¶ 7.

[3] *Id.* ¶ 8.

[4] JX 14.

[5] *Id.*

[6] Tr. 72:12–17.

[7] JX 4 at '095–96.

[8] JX 62.

("InHarv"), a venture capital firm,[9] which owns 24.4% of the Company's stock.[10] Langer and Anderson are co-founders of Verseau.[11]

Plaintiffs are venture capital firms and preferred stockholders of Verseau.[12] Together, Plaintiffs own 5.1% of the Company's stock.[13] Joel Marcus is the Executive Chairman of Alexandria Real Estate Equities, Inc., which is the managing member of Alexandria Venture and ultimate managing member of Alexandria Equities.[14] Aaron Jacobson is Senior Vice President and Venture Counsel of Alexandria Real Estate Equities, Inc.[15]

Marcus frequently attended Board meetings as one of Alexandria's Board observers.[16] At its March 13, 2020 meeting, the Board "expressed support for adding Marcus to the Board subject to receipt of the requisite stockholder consents."[17] The Company subsequently informed its preferred stockholders of the Board's decision

---

[9] *Id.* at '095.

[10] JX 62. The stock ownership reported for Golumbeski, S3Bio, InHarv, and Alexandria is on a fully diluted basis. *Id.*

[11] PTO ¶ 7.

[12] PTO ¶¶ 4–5. One or more representatives of Alexandria typically attend Board meetings. *See* JX 51 at '952, '958; JX 40 at '901, '909.

[13] JX 62.

[14] PTO ¶ 9.

[15] PTO ¶ 11.

[16] JX 51 at '952, '958; JX 40 at '901, '909.

[17] JX 40 at '903.

to add Marcus as a director.[18]  The Company told stockholders that Marcus would become a director after the stockholders agreed to expand the Board, a voting agreement was amended, and the Board formally elected Marcus.[19]  There is no evidence in the record that any of those events occurred, and I find that they did not.

## B.    Recent Hires at Verseau

After Golumbeski joined the Board, Verseau hired three former Celgene employees into senior positions.  In November 2019, Verseau hired Tim Smith, Celgene's former Executive Director of Business Development, as Verseau's new Chief Business Officer.[20]  In February 2020, Verseau hired Alise Reicin, Celgene's former President of Global Clinical Development, as Veseau's new Chief Medical Officer.[21]  Verseau hired another former Celgene employee as a senior advisor that same month.[22]  Smith's time at Celgene overlapped with Golumbeski's,[23] but there is no evidence in the record indicating that Golumbeski had directly worked with Smith.[24]  Reicin did not overlap with Golumbeski while at Celgene.[25]

---

[18] JX 1 at '093.

[19] *Id.* at '093–94.

[20] JX 59.

[21] JX 53.

[22] JX 52.

[23] *See* JX 58, 59.

[24] Dep. 22:5–23:18.

[25] *Id.*

5

## C.  Negotiation of the Term Sheet

In March 2020, Verseau needed cash, particularly to weather the global pandemic.  Verseau and Alexandria, an existing Verseau stockholder, then began discussing bridge financing.  On April 25, Alexandria sent to Verseau a non-binding term sheet that generally provided for Alexandria to lead a financing round of $30 million in convertible notes.[26]  Among other terms, the proposal provided investors a 2.0x return on investment in the event of a change in control.  It also gave Alexandria the right to designate a director to serve on the Board and specified Marcus as Alexandria's initial director designee.  Bunt sent Verseau's response a week later, stating that the proposal was generally "a fair balance for the company."[27]  Verseau pushed back, however, on a few provisions, two of which are pertinent to this Opinion.[28]

First, the Company resisted terms giving Alexandria significant power over Verseau's relationship with 3SBio, where Zhu was an officer.  Verseau had partnered with 3SBio on one recent project and anticipated partnering with 3SBio on a second project within the next year.[29]  Alexandria's initial proposal required approval by Alexandria's designated Board member for any related-party

---

[26] JX 5.

[27] *See* JX 6.

[28] *Id.*

[29] *Id.*

6

transaction with a value of $50,000 or more.[30] Verseau was concerned that this provision would jeopardize the Company's plans to partner with 3SBio, and it countered with terms expressly permitting the Company to allocate funds for the anticipated second partnership with 3SBio.[31] Alexandria balked, warning that "the company should be mindful of the amount of Chinese investment and control of technology."[32] After further negotiation, the final version of the term sheet required approval from holders of 67% of the notes, including one holder of at least $5 million, before Verseau could enter into related-party transactions.[33] Alexandria admitted that this term would essentially give Alexandria veto power over any transactions between Verseau and 3SBio.[34]

The second and most controversial provision prohibited the Company from compensating non-founder directors with cash.[35] Verseau generally agreed to this term, but it sought an exception that would have allowed the Company to continue compensating Golumbeski in cash for his consulting services.[36] Bunt stressed to

---

[30] JX 5 at '036 (requiring approval of a majority of the Board, including Alexandria's designated director, to enter into "any transaction with any director, officer or employee of the Company of any 'associate' . . . of any such person").

[31] JX 6 at '077.

[32] JX 8.

[33] JX 29.

[34] Tr. at 33–34.

[35] JX 5 at '035.

[36] JX 6 at '076.

Jacobson that Verseau pays Golumbeski $75,000 per year plus expenses, which she considered to be modest in relation to the value he added to the Company.[37] In an email to Marcus, Bunt warned that "we would [lose] most likely our Chairman at Verseau in acceptance of such a provision," which would be detrimental to the Company because Golumbeski "added tremendous value" and his involvement on the Board was "a very good situation."[38] According to Bunt, Alexandria's proposed restriction on Golumbeski's cash compensation was "a board issue" to which at least two other directors—Verseau co-founders Langer and Anderson—objected.[39]

Alexandria refused to budge. Marcus told Bunt that "[w]e are firm on this and [will not] change."[40] Internally, Marcus directed Jacobson to offer Golumbeski equity compensation instead of cash, and if Golumbeski would not agree, then "we [will not] lead the note[,] period."[41] According to Jacobson, when the Company presented this offer to Golumbeski, "he gave them a flat no."[42] The Company then offered to defer Golumbeski's cash payments and let them accrue until the next financing round, but Alexandria promptly rejected that counteroffer.[43] The parties

---

[37] JX 14 at '997.

[38] JX 26 at '962.

[39] *Id.*

[40] JX 10 at '733–34; JX 19.

[41] JX 19 at '540.

[42] *Id.* at '541.

[43] *Id.*

reached an impasse, with Alexandria describing this provision as "the last sticking point."[44]

On May 18, 2020, Alexandria delivered the final version of the term sheet (the "Term Sheet") to Verseau, demanding "a yes or no on the entire Term Sheet by 5pm pdt on Friday [May 22]."[45] The Term Sheet prohibited cash compensation to non-founder directors and further required Verseau to terminate any existing cash payments.[46]

On May 22, 2020, prior to the deadline, Bunt signed the Term Sheet on behalf of Verseau.[47] Although it was executed, the Term Sheet expressly permitted either party to propose different terms or unilaterally terminate all negotiations "without any liability whatsoever to the other party."[48] Verseau and Alexandria both understood that the Term Sheet required Board approval.[49]

## D. The Board Rejects the Term Sheet

At a June 4, 2020 meeting (the "June 4 Meeting"), the Board discussed the Term Sheet and other potential financing alternatives. The Board package from the

---

[44] *Id.*

[45] JX 27 at '063.

[46] JX 32.

[47] *Id.*

[48] *Id.*

[49] *See* JX 41 at '648; JX 39 at '642.

meeting contained a copy of the Term Sheet but no other documents regarding the proposed financing. [50] The Board discussed the Term Sheet in a closed session that excluded Bunt and Marcus.[51] According to the unsigned minutes of the June 4 Meeting, the Board concluded that

> the Alexandria term sheet in its current form was not in the best interest of the Company based on several factors, including the economic return to investors in the event of a change of control transaction, approval rights of the investors in regards to certain types of strategic transactions and Board-level decisions, and other terms which the Board determined were not within typical market parameters.[52]

The minutes also reflect that "Mr. Chang from [InHarv] stated that his firm was working on a bridge financing proposal that he believed would be more attractive to Verseau than the Alexandria proposal."[53] After further discussion, "and with Mr. Golumbeski refraining from expressing his view," the other directors unanimously agreed not to continue discussions with Alexandria and to await a proposal from InHarv.[54]

Verseau did not immediately inform Alexandria that the Board had rejected the Term Sheet. On June 11, 2020, Alexandria sent an email to Bunt, requesting

---

[50] JX 40.

[51] JX 56 at '027.

[52] *Id.*

[53] *Id.*

[54] *Id.*

details about the Board's consideration of the Term Sheet.[55] Bunt responded by referring Alexandria to Verseau's outside counsel.[56] On June 16, 2020, Verseau's outside counsel informed Alexandria by email that the Board had rejected the Term Sheet at the June 4 Meeting and decided to pursue alternative financing options.[57] The next day, Alexandria's outside counsel requested more information about the Board's executive-session rejection of the Term Sheet. Alexandria's letter raised "concern[s] that Board members did not discharge their duty of care or act in the best interests of Verseau and its stockholders" in rejecting the Term Sheet.[58] Alexandria urged the Board to reconsider its decision or continue discussions with Alexandria.

The Board reconsidered the Term Sheet at a special meeting on June 29, 2020 (the "June 29 Meeting"). According to the unsigned minutes of that meeting, Golumbeski and Chang were excluded from the Board's discussion of the Term Sheet.[59] The remaining directors unanimously rejected the Term Sheet, resolving that it was not in the best interest of the Company's stockholders. The minutes also reflect the resignations of two significant participants in Verseau's negotiations with

---

[55] JX 45 at '032.

[56] *Id.*

[57] JX 45 at '031.

[58] JX 46 at '045.

[59] JX 56 at '017–18.

Alexandria over the Term Sheet:  Bunt as CEO and as a director, and Bob Crane as Verseau's Chief Financial Officer.  The record does not indicate the circumstances of or motivations for those resignations. As before, Verseau did not initially tell Alexandria about the June 29 Meeting.

E.    **Alexandria's Inspection Demands**

On July 1, 2020, still unaware of the June 29 Meeting, Alexandria sent to Verseau a written demand to inspect books and records pursuant to Section 220 of the DGCL (the "Demand").[60] The Demand stated that Alexandria sought to investigate whether Board members failed to discharge their duty of care or to act in the best interests of stockholders in the directors' consideration of the Term Sheet and "Alternative Financing Options."[61]   The Demand listed seven categories of books and records related to its purpose.

Verseau rejected the Demand.[62]  In its July 2, 2020 rejection letter, Verseau revealed to Alexandria that the Board met again on June 29 to reconsider the Term Sheet.  The response stated that Golumbuski and one other director (later determined to be Chang) recused themselves and that following "a deliberate and lengthy

---

[60] JX 47.

[61] The Demand defined "Alternative Financing Options" as "any existing alternative financing options available to the Company as of May 22, 2020 or thereafter." *Id.*

[62] JX 48.

discussion" the Board unanimously rejected Alexandria's proposal.[63] The rejection letter further accused Alexandria of using its status as a stockholder to obtain "inside information as to how [the] board assessed its offer and what alternatives the board may be considering or preferring to its offer."[64] Verseau asserted that Alexandria's "primary interest [was] as a 'bidder,'" not a stockholder.[65] Despite rejecting the Demand, Verseau invited Alexandria to make an improved offer.

On July 9, 2020, Alexandria delivered a supplemental inspection demand (the "Supplemental Demand" and together with the Demand, the "Demands").[66] The Supplemental Demand articulated additional areas of concern to bolster Alexandria's suspicions of wrongdoing, including potential conflicts attributable to Golumbeski and Zhu, foreign investment in the Company, and the Company's treatment of Marcus, who had been excluded from the June 29 Meeting even though he thought he was a Board member. The Supplemental Demand added seven more categories of books and records to the scope of the inspection demanded. Verseau did not reply to the Supplemental Demand, and Alexandria filed the Verified Complaint to compel inspection of books and records on July 17, 2020.

---

[63] *Id.* at 4.

[64] *Id.* at 3.

[65] *Id.*

[66] JX 49.

On July 21, 2020, the Company provided three documents to Alexandria: (1) unsigned minutes from the June 4 Meeting; (2) unsigned minutes from the June 29 Meeting; and (3) a term sheet between the Company and InHarv, which was signed by the Company but not InHarv (the "InHarv Proposal").[67]

The InHarv Proposal is dated July 16, 2020 and reflects that the Company signed it on July 20, 2020.[68] The InHarv Proposal contained many of the same terms as the previously rejected Term Sheet, but differs in several material respects. First, it provides for a 1.5x return on investment in the event of a change-of-control transaction, as opposed to the Term Sheet, which provided for a 2.0x return. Second, the InHarv Proposal did not provide for board representation. Third, there were no restrictions on related-party transactions. Fourth, there were no limits on cash compensation to directors. Like the Term Sheet, the InHarv Proposal was non-binding, allowed the parties to propose different terms, and could be unilaterally terminated by either side without liability to the other party. As of the date of trial, there was no indication that the InHarv Proposal or any other alternative financing transaction had been consummated.

---

[67] JX 56.

[68] The InHarv Proposal is signed by Smith, who is identified as the Company's President and Chief Business Officer. *Id.* at '012–15.

Alexandria remained unsatisfied with Verseau's limited production, and Alexandria pursued inspection of each category of books and records identified in its Demands. Verseau did not produce any additional books and records, and the case proceeded to a half-day trial on a paper record on October 1, 2020.

## II.    LEGAL ANALYSIS

To obtain an order compelling inspection of books and records under Section 220, a plaintiff must establish by a preponderance of the evidence that it: (1) is a stockholder of the corporation, (2) has complied with the statute's technical requirements, and (3) has a proper purpose for conducting inspection.[69] If the plaintiff meets these requirements, then it must prove, again by a preponderance of the evidence, that each category of books and records requested is necessary to accomplish that proper purpose.[70] Verseau does not dispute Alexandria's status as a stockholder or the Demands' technical statutory compliance. Instead, Verseau contends that Alexandria has not established a proper purpose and that the books and records requested are not necessary to satisfy Alexandria's stated purposes.

---

[69] *Lebanon Cty. Empls.' Ret. Fund v. AmerisourceBergen Corp.,* 2020 WL 132752, at *6 (Del. Ch. Jan. 13, 2020), *aff'd*, 2020 WL 7266362 (Del. Dec. 10, 2020).

[70] *Id.*

### A. Proper Purpose

A stockholder of a Delaware corporation may inspect the corporation's books and records for "any proper purpose."[71] A proper purpose "mean[s] a purpose reasonably related to such person's interest as a stockholder."[72] A purpose is not proper if it is made solely to harass the corporation or where it is adverse to the best interests of the corporation.[73] Once the court has found that the stockholder's primary purpose is proper, any secondary or ulterior purposes is irrelevant.[74] The court may, however, take into account an ulterior purpose when considering the permitted scope of inspection.[75]

A common proper purpose is "to investigate allegedly improper transactions and mismanagement."[76] A stockholder seeking to inspect books and for mismanagement "must show, by a preponderance of the evidence, a credible basis from which the court can infer there is 'possible mismanagement as would warrant

---

[71] 8 *Del. C.* § 220(b).

[72] *Id.*

[73] *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

[74] *AmerisourceBergen Corp. v. Lebanon Cty. Emps.' Ret. Fund*, __ A.3d ___, 2020 WL 7266362, at *4 (Del. Dec. 10, 2020).

[75] *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 167 (Del. Ch. 1987) ("Plaintiff's ulterior purpose will, however, be taken into account in determining the scope of the relief to which [Plaintiff] would be entitled."); *see also Henshaw v. Am. Cement Corp.*, 252 A.2d 125 (Del. Ch. 1969).

[76] *Woods Tr. of Avery L. Woods Tr. v. Sahara Enterprises, Inc.*, 238 A.3d 879, 889 (Del. Ch. 2020).

16

further investigation.'"[77] This standard is "the lowest possible burden of proof," and it is far below the burden of proof necessary to show that any actionable wrongdoing actually occurred.[78]

In the Demand, Alexandria's stated purpose is to evaluate whether any breaches of fiduciary duty occurred, including whether "Board members did not discharge their duty of care or act in the best interests of Verseau and its stockholders" when they rejected the Term Sheet. The Supplemental Demand identifies additional "concerns" about Golumbeski's influence over personnel decisions, 3SBio's relationship with the Company, and the Company's "conflicting messages" regarding Marcus's status as a Board member.[79]

Alexandria's pretrial brief slices its sole stated purpose—to investigate possible breaches of fiduciary duty—into five separate purposes, which include the "concerns" from the Supplemental Demand.[80] This Opinion addresses the issues concerning the Term Sheet collectively, followed by the remaining areas of requested inspection.

---

[77] *AmerisourceBergen,* 2020 WL 7266362, at *5 (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).

[78] *Id. See also Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006).

[79] JX 49 at 3. Alexandria did not identify its concern about Marcus's Board membership in the Pretrial Stipulation and Order as one of its purposes. PTO ¶ 28.

[80] Plaintiffs' Pretrial Brief ("Pls.' Br.") 29.

### 1. Rejection of the Term Sheet

Alexandria seeks to evaluate "whether Board members discharged their duty of care and acted in the best interests of Verseau and its stockholders" when the Board considered and rejected the Term Sheet.[81] A plaintiff seeking books and records to investigate whether a corporate board breached its duty of care must establish a credible basis to suspect that the board acted with gross negligence.[82] "Mere disagreement with a business decision is not enough" to establish that credible basis.[83] Furthermore, "a poorly formulated or executed negotiation strategy, without more, does not a gross negligence claim make."[84]

Alexandria alleges that the Board might have breached its duty of care in rejecting the Term Sheet, because Verseau needed financing and the Board did not have any other then-existing financing proposals.[85] Indeed, the Board believed that the Company's current cash position would only carry it to early 2021.[86] Alexandria further notes that, as of trial, the Company still had not indicated whether it had obtained needed financing.

---

[81] PTO ¶ 28(a).

[82] *Hoeller v. Tempur Sealy Int'l, Inc.*, 2019 WL 551318, at *10 (Del. Ch. Feb. 12, 2019).

[83] *High River Ltd. P'ship v. Occidental Petroleum Corp.*, 2019 WL 6040285, at *5 (Del. Ch. Nov. 14, 2019).

[84] *Hoeller*, 2019 WL 551318, at *10.

[85] *See* Pls.' Br. 32–33.

[86] JX 42 at '098–99.

Verseau insists that Alexandria is merely suggesting a disagreement with the Board's business decision.[87] But, regardless of whether the rejection of the Term Sheet was "within the ambit of reasonable Board determinations," there may still be a credible basis to suspect wrongdoing if Alexandria "sufficiently portrays [the Board's determination] as infected and spurred by self-interest and conflicts among decision-makers and their advisors."[88] Alexandria attempts to make that portrayal here by focusing on three directors in particular.

Alexandria first points to Golumbeski. Alexandria maintains that the Board may have rejected the Term Sheet because the provision prohibiting cash compensation to non-founder directors would have adversely affected Golumbeski. Golumbeski participated in the June 4 Meeting, where the Term Sheet was first discussed, although the draft minutes state that he refrained from expressing his view and did not vote on whether to accept the Term Sheet.[89] Even prior to that meeting, other members of the Board, including directors who had worked closely with Golumbeski and had cultivated "a lot of respect" for him, were purportedly concerned that he might walk away from the Company if it accepted Alexandria's

---

[87] *See AmerisourceBergen*, 2020 WL 7266362, at *4 ("[M]ere disagreement with a business decision will fail to establish a proper purpose.").

[88] *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *11 (Del. Ch. Jan. 25, 2019), *aff'd,* 237 A.3d 818 (Del. 2020).

[89] JX 56 at '027.

restrictive proposal.[90] Alexandria contends that it is conceivable that Golumbeski influenced other directors to reject the Term Sheet out of a self-interested motivation to preserve his cash compensation rather than in the interests of the Company's stockholders.

Alexandria next argues that Zhu was conflicted because of the Term Sheet's limitation on related-party transactions, which essentially would have given Alexandria a veto right over Verseau's ability to partner with 3SBio. Zhu, a 3SBio executive, attended both the June 4 and June 29 Meetings and voted with the Board in rejecting the Term Sheet.[91]

Alexandria contends that Chang was also conflicted because he proposed a potential alternative financing proposal from his investment firm, InHarv, at the June 4 Meeting.[92] Although Chang recused himself from the June 29 Meeting, he participated in the consideration of the Term Sheet at the June 4 Meeting and voted to reject the Term Sheet.[93]

Alexandria also points to the resignations of Bunt and Crane—two senior officers involved in the Term Sheet negotiations on behalf of the Company—which are noted in the minutes from the June 29 Meeting, as additional evidence supporting

---

[90] JX 26 at '962.

[91] JX 56 at '018, '027.

[92] Pls.' Br. 35.

[93] JX 56 at '027.

Alexandria's suspicions of potential fiduciary duty breaches in connection with rejection of the Term Sheet.[94]

Verseau maintains that Alexandria has not established a credible basis to infer wrongdoing because "Plaintiffs do not, and cannot, contest . . . that each of the decisions at issue was made by a Verseau Board consisting of a majority of independent and disinterested directors."[95] Verseau's argument cannot carry the day. As this Court observed in *Khanna v. Covad Communications Group, Inc.*, 2004 WL 187274 (Del. Ch. Jan. 23, 2004),

> [the company] argues that various transactions were approved by a majority of directors whose independence and disinterestedness are not fairly questioned by [Plaintiff]. Instead of contesting whether [Plaintiff] has a credible basis for believing that corporate wrongdoing occurred, [the company] attempts to debate whether [Plaintiff] will ultimately prevail. A Section 220 action is not the proper forum for litigating a breach of fiduciary duty case.

*Id.* at *6. In *AmerisourceBergen Corp. v. Lebanon County Employees' Retirement Fund*, the Delaware Supreme Court recently reaffirmed that, except in one circumstance not pertinent here, the Court of Chancery should "defer the consideration of defenses that do not directly bear on the stockholder's inspection rights, but only on the likelihood that the stockholder might prevail in another

---

[94] Pls.' Br. 37.

[95] Defendant's Pretrial Brief ("Def's. Br.") 27.

action."[96] A stockholder can obtain books and records if it establishes a credible basis from which the Court can infer possible mismanagement or wrongdoing, such as a conflicted transaction, and "[t]he stockholder need not demonstrate that the alleged mismanagement or wrongdoing is actionable."[97]

In challenging Alexandria's purposes, Verseau relies upon cases that found no credible basis to infer wrongdoing. In each of those cases, there was no evidence of a conflict of interest. For example, in *High River Ltd. Partnership v. Occidental Petroleum Corp.*, 2019 WL 6040285 (Del. Ch. Nov. 14, 2019), the court found no credible basis of suspected wrongdoing after the board made what the plaintiffs thought were bad deals, because nothing in the record suggested that there was any conflict of interest. According to the Court, "[the plaintiffs] have not alleged, much less proven, that the [board] was conflicted, disloyal or in some way interested in the transactions at issue." *Id.* at \*5; *see also Hoeller v. Tempur Sealy Int'l, Inc.*, 2019 WL 551318, at \*9 (Del. Ch. Feb. 12, 2019) ("Plaintiff also failed to present any evidence even remotely suggesting that [the company's] fiduciaries were motivated by self-interest."). In *City of Westland Police & Fire Retirement System. v. Axcelis*

---

[96] *AmerisourceBergen Corp. v. Lebanon Cty. Empls.' Ret. Fund*, __ A.3d ___, 2020 WL 7266362, at \*14 (Del. Dec. 10, 2020); *see also id.* at \*13 ("[A] Section 220 proceeding 'is not the time for a merits assessment of Plaintiffs' potential claims against [the corporation's] fiduciaries.'" (citing *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at \*2 (Del. Ch. May 30, 2019)).

[97] *AmerisourceBergen*, 2020 WL 7266362, at \*13.

22

*Technologies, Inc.*, 1 A.3d 281 (Del. 2010), the alleged conflicts related to motivations of entrenchment rather than third-party allegiances. The Supreme Court affirmed this Court's finding that there was "no support in the record of any entrenchment motive," concluding that "the record provides no credible basis to infer that the Board's rejections of the [acquisition] proposals . . . were other than good faith business decisions." *Id.* at 288.

Verseau next argues that Alexandria cannot infer wrongdoing from the Board's decision to reject, rather than accept, a proposed offer.[98] In response, Alexandria relies heavily upon *Paraflon Investments, Ltd. v. Linkable Networks, Inc.*, 2020 WL 1655947, (Del. Ch. Apr. 3, 2020). There, the plaintiff sought to investigate, among other issues, the board's failure to enforce a term sheet that would have provided financing when the company was within months of insolvency. The company said that it rejected the financing because the terms were too onerous. The plaintiff argued, however, that the rejection of the term sheet was really a concession to the financing counterparty, which had a representative on the board. In granting inspection, the Court found a credible basis to infer that the counterparty's presence on the board may have improperly influenced the directors to "elevate[] [the counterparty's] interests over the Company's."[99] As in *Paraflon*, the Verseau Board

---

[98] Tr. 74–75.

[99] *Paraflon*, 2020 WL 1655947, at *5.

rejected proposed financing when it was facing a short cash runway, and Alexandria argues that the rejection could have resulted from prioritization of InHarv's, 3SBio's, or Golumbeski's interests (or a combination thereof) rather than Verseau's interests. In *Paraflon*, the alleged interestedness of just one director was sufficient to establish a credible basis to suspect potential wrongdoing.[100]

There are two noteworthy distinctions between this case and *Paraflon*. First, the conduct at issue in *Paraflon* had reached a conclusion. The company did not receive a financial infusion, it ran out of cash six months later, and its assets were sold for "pennies on the dollar."[101] The stockholder sought to investigate whether the board's refusal to enforce the term sheet caused the company's demise. Thus, there was no longer the prospect of a new lender coming forward to keep the company afloat. Second, and somewhat related, the plaintiff stockholder in *Paraflon* was not the counterparty to the proposed investment term sheet.

Unlike in *Paraflon*, the situation here is, or at least at the time of trial was, more fluid. Verseau may still obtain a funding source. There is also a seeming risk that Alexandria could be using its inspection rights to advance its interest as a counterparty to a transaction—either by using the information to obtain an unfair

---

[100] *See also Everett v. Hollywood Park, Inc.*, 1996 WL 32171, at *5 (Del. Ch. Jan. 19, 1996).

[101] *Paraflon*, 2020 WL 1655947, at *1.

24

advantage in submitting a new bid or using the information to commence litigation to enforce the Term Sheet as a counterparty. While these are legitimate concerns, they are not sufficient to defeat Alexandria's stated purpose as a stockholder in this case.[102] To be sure, Verseau's letter rejecting the Demand asserted that Alexandria's primary interest in seeking inspection was as a bidder, not a stockholder.[103] But Verseau did not press that theory at trial and did not assert an improper ulterior purpose defense in this action, which would have required Verseau to make a difficult, fact-intensive showing.[104]

To some extent, Alexandria's evidentiary support for the alleged director conflicts has a bit of a rabbit-in-the-hat quality to it. Two of the three asserted director conflicts arising from rejection of the Term Sheet were Alexandria's own creations. Golumbeski's alleged conflict arose from Alexandria's insistence that no cash compensation could be paid to non-founder directors. Zhu's alleged conflict

---

[102] Jacobson testified that Alexandria has no further interest in negotiating a new financing deal with the Company. Dep. 103:20–105:13. Even if it did, the Court can fashion an order to protect the Company's interests. *See* 8 *Del. C.* § 220(c) ("The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper."). *See also Radwick Pty., Ltd v. Med., Inc*, 1984 WL 8264, at *3 (Del. Ch. Nov. 7, 1984) ("[I]nspection rights may be limited where production of certain documents would be adverse to the interests of the corporation.").

[103] JX 48 at 3.

[104] A corporate defendant may resist a books and records demand if it can demonstrate that the stockholder's stated purpose is not its actual purpose for inspection. *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007). To do so, the corporation essentially must show that "the plaintiff pursued its claim under false pretenses." *Id.*

25

was created by Alexandria's demand for an effective veto right over related-party transactions.

Despite these concerns, however, there is other evidence to support Alexandria's purpose. First, the Company was in need of a financial infusion, and it appeared at the time of the Board's initial consideration of the Term Sheet that no other source was available. Second, after much negotiation, the Company's CEO signed and agreed to present to the Board a term sheet, albeit non-binding, which included the provisions that gave rise to the potential director conflicts. Third, Chang's representation of InHarv's sudden interest in making a financing proposal arose at the time of the Board's June 4 rejection of the Term Sheet. Fourth, the Board's second rejection of the Term Sheet at the June 29 Meeting appears to coincide with the resignations of the Company's CEO and CFO, both of whom were directly involved in negotiating the Term Sheet. Viewed in context and in its totality, the evidence, both direct and circumstantial, satisfies the very low threshold necessary to establish a credible basis to suspect that the directors may have favored the interests of certain directors or their affiliates over the Company's interests in rejecting the Term Sheet.

### 2. Golumbeski's Alleged Self-Interested Conduct

Beyond the Term Sheet and the Board's consideration of financing alternatives, Alexandria seeks to investigate whether Golumbeski acted out of self

26

interest by making or influencing decisions regarding Company personnel and commercial arrangements. Alexandria requests books and records concerning hiring decisions that have occurred since Golumbeski joined the Board. Golumbeski was the Executive Vice President of Business Development at Celgene for several years prior to joining Verseau's Board in 2019.[105] Since then, Verseau has hired three former Celgene employees into senior positions.[106] Alexandria argues that Golumbeski has been trying to increase his influence and control over Verseau[107] and points to the resignations of the CEO and CFO at the end of June 2020 and the elevation of Smith (a former Celgene employee) to President and Chief Business Officer of Verseau.[108]

In cases where this Court has found a credible basis to infer wrongdoing from a fiduciary's hiring decisions, the decisions involved potential malfeasance, such as an officer's concealing material information from a board's hiring committee[109] or the board's approving an excessive compensation package.[110] Mere disagreement

---

[105] JX 14.

[106] *Supra* section I.B.

[107] Pls.' Br. 37.

[108] JX 56 at 12.

[109] *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780 (Del. Ch. 2016).

[110] *See In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 279 (Del. Ch. 2003).

with who Verseau hires, however, does not create a credible basis to suspect potential wrongdoing.[111]

Alexandria has not presented evidence that Golumbeski has received or would receive improper benefits from the hiring of former Celgene employees. Nor is there evidence to reasonably infer that the hiring decisions were not aligned with the interests of Verseau or its stockholders. For these reasons, Alexandria has not stated a proper purpose to inspect records concerning Golumbeski's role in hiring decisions or recommendations.

### 3. Zhu's Alleged Self-Interested Conduct

Alexandria seeks to evaluate whether Zhu may have been motivated by self-interest in his consideration of "other Verseau business." Alexandria does not explain what "other Verseau business" entails, and it does not even hint of Zhu's having engaged in any wrongdoing. Presumably, Alexandria's targeting of Zhu is grounded in its general statement of concern during Term Sheet negotiations over Verseau doing business in China.[112] This request falls squarely into the category of "[m]ere curiosity or desire for a fishing expedition [which] will not suffice" to permit inspection.[113]

---

[111] *AmerisourceBergen,* 2020 WL 7266362, at *4 ("[M]ere disagreement with a business decision will fail to establish a proper purpose.").

[112] JX 8.

[113] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997).

28

### 4. Marcus's Membership on the Board

Alexandria's final purpose is to evaluate the Board's process for nominating and appointing Marcus to the Board. Alexandria has not presented evidence establishing a credible basis from which I can infer wrongdoing regarding Marcus's purported membership on the Board. [114] The Board's forward-looking statements that Marcus would become a director if additional approvals were secured, even coupled with Marcus's belief that he was a director, do not create an inference that Board members acted out of self-interest, in bad faith, or in breach of fiduciary duty. If Alexandria or Marcus believes that Marcus was duly appointed to the Board, the appropriate avenue for relief is through an action under DGCL Section 225, which is a separate summary proceeding. [115]

Nevertheless, the Term Sheet expressly provided that Marcus would be Alexandria's initial Board designee if the Term Sheet was approved. Thus, to the extent that Marcus's service as a prospective director was considered or discussed

---

[114] Verseau makes a credible argument that Alexandria waived this purported purpose by not expressly including it in the Pretrial Order and Stipulation. Tr. 88–89; *see* PTO ¶ 28 (omitting any reference to Marcus's purported director status as among the purposes of inspection). Because I find that this is not a proper purpose, I need not address the waiver argument.

[115] 8 *Del. C.* § 225(a) (allowing the Court of Chancery, upon application of any stockholder or director whose title to office is contested, to determine the validity of any appointment or removal of any director or officer of a corporation). There is also no evidence that Marcus sought to inspect books and records in his capacity as a director under DGCL §220(d), which further undermines Alexandria's assertion that Marcus considered himself to be a director of Verseau.

as part of the Board's decision to reject the Term Sheet, it is a proper subject for inspection.

## B. Scope of Inspection

Having concluded that Alexandria has established a proper purpose to inspect Verseau's books and records, the Court must next determine which books and records Alexandria is entitled to inspect. The Demands state that Alexandria seeks "[t]o evaluate whether any fiduciary breaches have occurred."[116] Alexandria's pretrial brief argues that it is entitled to "'enough information to effectively address the problem, [including] through derivative litigation.'"[117] "[W]hen a books and records action is brought with the goal of evaluating a possible derivative suit, the books and records that satisfy the action are those that are required to prepare a well-pleaded complaint."[118] Therefore, Alexandria should be afforded the opportunity to inspect documents that would enable it to draft a well-pleaded complaint for any subsequent derivative litigation.

---

[116] JX 49 at 2.

[117] Pls.' Br. 45 (alteration in original) (quoting *Saito v. McKesson HBOC, Inc.* 806 A.2d 113, 115 (Del. 2002).

[118] *Kaufman v. CA, Inc.*, 905 A.2d 749, 753 (Del. Ch. 2006); s*ee also Saito*, 806 A.2d at 115. "[W]here a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders.").

On the other hand, a Section 220 demand "does not open the door to the wide ranging discovery" like a well-pleaded complaint would.[119] "The inspection should stop at the quantum of information that the court deems 'sufficient' to accomplish the plaintiff's stated purpose."[120] The burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is sufficient for the stockholder's stated purpose.[121]

"[T]he court's duty to closely examine any Section 220 demand"[122] does not eliminate the expectations that the stockholder will make good-faith demands "with reasonable particularity"[123] and that the company will "provide [certain] documents voluntarily without forcing stockholders to litigate over them."[124] If the parties have not "meaningfully conferred concerning the scope of production necessary and essential to meet Plaintiff's purposes," then the Court is justified in sending the

---

[119] *Saito*, 806 A.2d at 114; *see also Kaufman*, 905 A.2d at 754 ("Section 220 is not meant as a replacement for discovery under Rule 34.").

[120] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 788 (Del. Ch. 2016); *see also KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 752 (Del. 2019) ("[T]he court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'").

[121] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[122] *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 164 (Del. Ch. 2006).

[123] *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *4 (Del. Ch. Aug. 8, 2017).

[124] *Pettry v. Gilead Sciences, Inc.*, 2020 WL 6870461, at *24 (Del. Ch. Nov. 24, 2020).

parties back to the negotiating table.[125] The Court, of course, retains jurisdiction to ultimately resolve any remaining disputes.

Alexandria's books and records demand reads like a discovery request in a plenary action.[126] For example, the first request seeks to inspect "[a]ll written or electronic documents or other records relating to Defendant's consideration, if any, of the Term Sheet and any Alternative Financing Option including, without limitation, copies of all minutes of Board meetings discussing or considering the Term Sheet or Alternative Financing Options, notes taken of said discussions or consideration, and any emails or texts by Defendant's officers, directors, agents or advisors relating to said discussion or consideration."[127] Alexandria makes similarly expansive demands for "[a]ll written or electronic documents or other records relating to any actions taken by Defendant, if any, and the reasons for said actions, with respect to the Term Sheet or Alternative Financing Options" and for "[a]ll written or electronic or other records relating to the information provided to the Board or to individual directors about the Term Sheet or Alternative Financing

---

[125] *Kosinski v. GGP Inc.*, 214 A.3d 944, 957–58 (Del. Ch. 2019).

[126] *See, e.g.*, *Lavin v. W. Corp.*, 2017 WL 6728702, at *14 (Del. Ch. Dec. 29, 2017) (describing a demand that sought, for example, "all books and records provided to or referred by the individuals who drafted the [Proxy]" as "land[ing] with the precision of buckshot").

[127] PTO ¶ 29(a).

Options."[128]  These broad-ranging requests do not demonstrate a sufficient effort by Alexandria to describe with reasonable particularity the documents it wishes to inspect.  At trial, Alexandria did not dispute Verseau's assertion that Alexandria did nothing to try to narrow the scope of its requests.[129]

### 1. Formal Board Materials

"The starting point (and often the ending point) for an adequate inspection will be board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered (the "Formal Board Materials").  A corporation should be able to collect and provide its Formal Board Materials promptly and with minimal burden."[130]  To that end, the Company has produced only three traditional, non-electronic documents: the unsigned minutes of the June 4 Meeting and June 29 Meeting, and the InHarv Proposal signed only by the Company.  That is not, however, the universe of documents that Alexandria possesses concerning the Term Sheet.  Through its Board observers, Alexandria has received numerous Board materials, including meeting agendas, board packages, and meeting minutes.  Those materials included the agenda and board package for the June 4 Meeting.

---

[128] *Id.* ¶ 29(b)–(c).

[129] Tr. 65:18–67:20.

[130] *Lebanon Cty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *24 (Del. Ch. Jan. 13, 2020), *aff'd,* __ A.3d ___, 2020 WL 7266362 (Del. Dec. 10, 2020).

33

Alexandria also possesses documents evidencing the parties' negotiations over the Term Sheet, including the emails, phone calls, and counterproposals exchanged between Verseau and Alexandria. The trial record also reflects that Bunt and Crane were candid with Marcus and Jacobson throughout the negotiations in describing the Company's concerns about certain provisions in the Term Sheet.[131]

Considering the documents already in Alexandria's possession, Alexandria is entitled to inspect, subject to any assertion of attorney-client privilege or attorney work product, any agenda or materials distributed to the Board in connection with the June 4 and June 29 Meetings, to the extent they have not been produced, and any financing agreement entered into by the Company since May 22, 2020. In addition, Alexandria is entitled to inspect the document or documents that contain the terms of Golumbeski's consulting arrangement with the Company (and any amendments thereto) and any director questionnaires or similar Company files that reflect the relationships among the directors, to the extent Verseau maintains such records.[132]

---

[131] *See* JX 6, 9, 12, 17, 19, 23, 26, 27, 57.

[132] *Yahoo*, 132 A.3d at 785 ("[T]he Delaware Supreme Court has indicated that a plaintiff could obtain 'a file of the disclosure questionnaires for the board' or similar materials that could 'provide more detail about the thickness of the relationship[s]' in the boardroom." (citing *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 (Del. 2015)).

## 2. Other Books and Records

Alexandria seeks not only Formal Board Materials but also electronic documents, including emails and text messages.[133] In *Palantir*, the Delaware Supreme Court addressed the circumstances under which electronic documents must be produced in response to a books and records demand:

> If a corporation has traditional, non-electronic documents sufficient to satisfy the petitioner's needs, the corporation should not have to produce electronic documents. But when a petitioner . . . reasonably identifies the documents it needs and provides a basis for the court to infer that those documents likely exist in the form of electronic mail, the respondent corporation cannot insist on a production order that excludes emails even if they are in fact the only responsive corporate documents that exist and are therefore by definition necessary.[134]

Verseau resists the production of emails, arguing that the Formal Board Materials already provided to Alexandria are sufficient to satisfy Alexandria's stated purposes. Alexandria disagrees and insists that it needs electronic communications because the produced documents "are sparse and raise more questions than they answer."[135]

Under *Palantir*, to obtain electronic documents, Alexandria must "provide[] a basis for the court to infer that those [additionally demanded] documents likely

---

[133] *See*, *e.g.*, PTO ¶ 29(a).

[134] *Palantir*, 203 A.3d at 756.

[135] Pls.' Br. 44, 46, 47, 51.

exist in the form of electronic mail."[136] Alexandria primarily points to the "sparse" Board materials previously produced, which omit discussions that should have occurred, in Alexandria's view, between the Board and Verseau's officers or advisors.

The existence of formal Board minutes does not eliminate the possibility that informal board deliberations occurred via email communications among the Board members in advance of the formal Board meetings. But despite having Board observers, Alexandria has not provided evidence that Verseau's Board informally conducts or conducted corporate business via email and text messages. This lack of evidence was not necessarily for lack of trying. Alexandria's interrogatories directly asked whether Board members engaged in electronic communication regarding the Term Sheet, but Verseau objected to the interrogatory as overbroad and answered

---

[136] *Palantir*, 203 A.3d at 756; *see also id.* ("KT4 also submitted evidence that Palantir had conducted other corporate business informally, including over email in connection with the September 2016 Amendments."); *Mudrick Capital Mgmt., L.P. v. Globalstar, Inc.*, 2018 WL 3625680, at *9 (Del. Ch. July 30, 2018) ("Mudrick Capital has adequately shown that (1) the produced documents do not allow it to adequately address the stated purposes, and (2) the produced documents also suggest that other documents exist, including emails, that address the crux of the stated purposes and are unavailable from another source."); *Bucks Cty. Empls. Ret. Fund v. CBS Corp.*, 2019 WL 6311106, at *9 (Del. Ch. Nov. 25, 2019) ("Plaintiff has demonstrated that Redstone, the Viacom board and the CBS Board communicated by means of text messages and emails regarding company business and there is an absence of board-level materials relating to this narrow topic."); *Yahoo*, 132 A.3d at 795 ("The record provides reason to believe that there are additional books and records beyond the Board–Level Materials that are essential to Amalgamated's inspection. . . . That seems particularly true for events in January 2014, where the official record of Committee involvement is decidedly sparse.").

only vaguely that "communications by individuals using a Company email account are located on the Company's servers."[137]

As the Delaware Supreme Court recently held, the Court of Chancery may defer judgment on the inspection of documents beyond Formal Board Materials if the record is not sufficiently developed to determine the necessity of those documents.[138] In *AmerisourceBergen*, this Court ordered the production of Formal Board Materials and deferred its decision on whether the plaintiff was entitled to inspect additional books and records. Vice Chancellor Laster recognized that determining the necessity of any category of documents is a fact-intensive inquiry, but that the defendant had "created an additional obstacle to conducting the inquiry when it refused to disclose in discovery the types and custodians of the records it maintains."[139] The Court granted the plaintiff further discovery into the existence of additional records and instructed the parties to confer on a final order of inspection. If no agreement could be reached, the plaintiff was permitted to return and ask the Court to compel production of necessary books and records. The Supreme Court affirmed the trial court's decision as within its discretionary power:

> We understand the court to have found that the Plaintiffs were entitled
> to the Formal Board Materials and to have reserved judgment, subject

---

[137] JX 54 at 9, 11–12.

[138] *AmerisourceBergen Corp. v. Lebanon Cty. Empls.' Ret. Fund*, __ A.3d ___, 2020 WL 7266362, at *14 (Del. Dec. 10, 2020).

[139] *Id.*

37

to additional discovery, as to the Informal Board Materials and the Officer-Level Documents. Seen in that light, the court's ruling is a discovery ruling in an ongoing proceeding and thus within the court's discretion. But even if the ruling were to be viewed as the court's post-trial remedial order, the ruling is still within the court's discretion.[140]

Similarly, I find it appropriate to defer judgment on whether Alexandria is entitled to inspect documents beyond Formal Board Materials. In my view, the parties have not meaningfully conferred on scope, and Verseau has resisted providing information as to the existence of relevant electronic communications. The parties are directed to meet and confer as to whether the Board informally considered, via email or text message, the Term Sheet or the InHarv Proposal in advance of the June 4 or June 29 Meetings, and to confer on the final order of inspection. If the parties are unable to agree, then the parties are directed to submit letters of no more than ten pages setting out their respective positions on a form of final order.

## III. CONCLUSION

For the foregoing reasons, Verseau shall produce the documents specified herein and the parties shall confer on the final order of inspection, as directed.

IT IS SO ORDERED.

---

[140] *Id.*